A03A0689. FREIGHTLINER CHATTANOOGA, LLC v. WHITMIRE.
(584 SE2d 724)

ADAMS, Judge.

Mark Whitmire filed suit against Freightliner Chattanooga, LLC for breach of contract and attorney fees claiming that the company made defective repairs to his truck. At trial, the jury awarded Whitmire $89,522 in compensatory damages and $11,000 in attorney fees. Freightliner appeals following the denial of its motions for directed verdict and for new trial, asserting that there was insufficient evidence to support the jury's verdict. We affirm.

In considering Freightliner's claims on appeal we construe the evidence to uphold the jury's verdict and determine whether any evidence authorizes the verdict. *Fulton County Bd. of Tax Assessors v. Visiting Nurse Health System &c.*, 256 Ga. App. 475 (2) (568 SE2d 798) (2002); *Bicknell v. Joyce Sportswear Co.*, 173 Ga. App. 897 (1) (328 SE2d 564) (1985). Viewed in that light, the record shows that Freightliner is an independent heavy truck dealership that sells and repairs heavy trucks. Whitmire is an independent hauler in the trucking business, who operated at various times under the names Mark Whitmire Trucking and AAA Asphalt. In connection with his business, Whitmire owned a 1994 Ford dump truck, which he used for hauling asphalt and other materials. Whitmire purchased the truck in new condition from a Birmingham, Alabama dealership in 1995.

On September 9, 1998, Whitmire's stepson, Chad Tinker, was driving the dump truck as Whitmire's employee. As Tinker drove across a train track, he collided with an oncoming train, damaging

the truck's right passenger side. Later that day, the truck was towed to Freightliner's dealership in Ringgold, Georgia, for repairs. Before beginning work, Freightliner prepared an estimate in the amount of $11,468.72. State Farm, Whitmire's insurance company, authorized payment of almost $11,000 toward the repairs on September 14, 1998.

Whitmire, however, was concerned that the initial estimate did not address all of the damage to the truck, especially with regard to the frame and the transmission. He had hired an attorney to help him interpret whether his insurance policy provided for the rental of a dump truck during the repair period, and he subsequently asked the attorney to correspond with Freightliner to express his concerns regarding the repairs. On September 17, 1998, the attorney wrote Freightliner a letter raising a number of questions about the initial estimate. In particular, the letter questioned Freightliner's failure to fully address possible damage to the transmission and frame of the truck.

Although Whitmire subsequently authorized Freightliner to begin repairing the truck, this authorization was given with the understanding that should the need for additional parts and/or repairs arise, Freightliner would contact State Farm and request further authorization. Whitmire also told Freightliner that it was very important that the truck be repaired correctly and in a timely fashion, because he needed the truck to operate his business. He was especially concerned about losing his senior position on the call list with Southeastern Materials, Inc. for which he performed the majority of his hauling services. Based upon his understanding that the work would be performed in a prompt and thorough fashion, Whitmire signed the final authorization to begin repairs on September 21, 1998, but he noted again on the authorization that he did not believe that the initial estimate completely addressed all of the truck's damage.

Gene Humphreys, Freightliner's body shop manager, understood that the company's agreement with Whitmire was to deliver the truck in pre-collision condition. He also understood the importance of getting the repairs done quickly because the truck was essential to Whitmire's business and to maintaining his position with Southeastern. He told Whitmire that the repairs would take approximately two to three weeks. Humphreys testified that he received a majority of the parts needed to repair Whitmire's vehicle by September 22, 1998.

During the course of the repairs, Whitmire visited the Freightliner shop to check on the truck's progress on numerous occasions. Although at times he observed Freightliner employees working on the truck, on other occasions he found it sitting unattended, with oil dripping from underneath the vehicle. Freightliner's records do not

reflect that any work was done on the truck prior to October. At one point, the truck sat against the back fence for several days and Whitmire became concerned about both the speed and quality of the repairs. He took pictures of the unattended truck showing where oil had dripped and brought them to Humphreys's attention. Humphreys replied that the truck was being handled by the service department at that point.

The truck was returned to Whitmire in ostensibly repaired condition on October 24, 1998, approximately four weeks after the repairs began. Whitmire found, however, that the truck would not operate properly and was leaking oil and other fluids. So a few days later, on or about October 28, he returned it to Freightliner to complete the repairs. Because it appeared that the leaking fluids came from the right side of the engine, the side originally struck by the train, Humphreys recommended to State Farm that the leak be fixed.

Whitmire picked the truck up again sometime in November, but he continued to experience problems. He attempted to use the dump truck to haul for Southeastern Materials, but the truck started breaking down and would not handle properly. On November 25, 1998, Whitmire took the truck to Fisher's Paint, Body & Frame Shop, Inc. for a second opinion. The shop foreman testified that when he examined the truck, he found a side sway in the frame rails, as well as some twists, which would have affected the truck's handling and resulted in premature wear to the tires.

Whitmire once again returned the truck to Freightliner, noting Fisher's findings. Humphreys then sent the truck to a body shop in Dalton for an independent estimate of the situation. Although Whitmire approved getting an estimate, he did not authorize the Dalton body shop to perform any work on the truck. Nevertheless, Freightliner authorized the body shop to repair the frame rails and billed the costs to Whitmire's insurance company.

Freightliner returned the truck to Whitmire for the last time on December 9, 1998. Whitmire then took the truck back to Fisher's for a follow-up inspection. Fisher's shop foreman testified that he found additional damage when he examined the truck the second time. He stated that the sway had been somewhat corrected, but it had not been done properly, requiring additional cost to fix the problem. On December 18, 1998, Whitmire took the truck to Lesco Truck Repair & Maintenance for problems with the front end and the brakes. There, the mechanic who examined the truck said that the tire was not properly connected to the truck and, in his opinion, was not safe to drive.

Whitmire and two of his employees testified that the truck continued to experience problems with leaking fluids and alignment, making it difficult to reliably operate and handle the truck. And as a

result of the problems and delays in repairing the truck, Whitmire lost his senior position with Southeastern, dropping to the bottom of the call list. The evidence also showed that while Whitmire put 111,000 miles on the truck in the three years prior to the accident, it had traveled only 8,000 miles in the three years since.

1. Freightliner first contends that there was insufficient evidence to support the jury's award of $89,522 in compensatory damages. The company asserts that Whitmire failed to establish that the repairs were defective and further failed to establish his damages. Moreover, Freightliner contends that the trial court erred in denying its motion for directed verdict with regard to lost profits as the evidence of such damages was too vague and speculative.

The parties' agreement was for the repair of Whitmire's truck to its pre-collision condition. And the parties had the mutual understanding that the repairs needed to be done in a timely fashion to protect Whitmire's position with Southeastern, a major source of his business income. Whitmire asserts that Freightliner breached this agreement by failing to either properly or timely repair the truck. Freightliner counters that Whitmire failed to establish that the repairs were defective or that the delay in repairing the vehicle was Freightliner's fault.

(a) When Whitmire authorized Freightliner to begin repairs, he expressed his concern that the company's estimate did not adequately address all the problems resulting from the train wreck, especially with regard to the frame rails and the transmission. Freightliner then kept the truck for almost four weeks before returning it to Whitmire as "repaired." Whitmire presented evidence that the truck did not operate properly and that he had to return it for further repairs because it was leaking fluids, a matter that Whitmire had earlier brought to Freightliner's attention when he observed the truck sitting unattended and dripping oil. Whitmire again took possession of the truck in November where he had it examined by an independent body shop which found that the rails had not been properly repaired. When Whitmire again returned the truck for further repairs, Freightliner unilaterally authorized a third party to repair the rails, which resulted in additional damage. And Whitmire presented evidence that the truck still was not working properly. Based on this evidence, the jury could properly conclude that Freightliner failed to repair the problems caused by the train wreck, resulting in the truck's continuing problems as well as in further damage to the frame. See *Jim Ellis Atlanta v. McAlister*, 198 Ga. App. 94, 96 (1) (400 SE2d 389) (1990).

In all, Freightliner had the truck for almost four months. And although there was evidence that there was some difficulty in getting parts and an initial delay before State Farm and Whitmire autho-

rized the work, there was also evidence that most of the parts had been received by September 22, but Freightliner did not begin working on the truck until October. And there was evidence that the truck sat idle for periods as long as several days. In addition, the jury could have found that over a month of the delay was attributable to Freightliner's failure to properly repair the truck in the first instance.

Accordingly, we find the evidence was sufficient to support a finding that Freightliner breached the contract as alleged by Whitmire.

(b) "Damages recoverable for a breach of contract are such as arise naturally and according to the usual course of things from such breach and such as the parties contemplated, when the contract was made, as the probable result of its breach." OCGA § 13-6-2. "[G]enerally, the proper measure of damages for defective workmanship would be the cost of repair of the defect . . . when claiming breach of contract." (Footnote omitted.) *Ryland Group v. Daley*, 245 Ga. App. 496, 498 (1) (a) (537 SE2d 732) (2000).

Whitmire testified that the cost of repairing the truck would be $14,400. He based his conclusion upon his prior experience with repairing dump trucks and the repairs subsequently done to the truck in this case, including $3,800 to repair the transmission. Freightliner did not object to this testimony, but rather conceded at trial that it was admissible for the jury's consideration. Moreover, Whitmire's damage figure was supported by other evidence, including estimates showing that it would cost approximately $1,500 to repair the frame rails, and Humphreys's testimony that it would cost $7,000 to replace them.

In addition, damages for "delay" in performing a contract "most often take the form of loss of use of the property involved . . . where the amount caused by delay of use of the property is provable with reasonable certainty." (Citations omitted.) *Doughty v. Simpson*, 190 Ga. App. 718, 721 (3) (380 SE2d 57) (1989). Such recovery can include loss of income on the property. See *White Repair &c. Co. v. Krasnoff*, 138 Ga. App. 613 (2) (227 SE2d 82) (1976); *Lurlee, Inc. v. Pernoshal-39 Co.*, 135 Ga. App. 724, 727 (1) (218 SE2d 701) (1975). Here, Whitmire sought to recover lost profits resulting from the loss of use of the truck, including the loss of his senior position on the Southeastern call list. Based upon the evidence, the jury could have concluded that Freightliner's failure to properly repair the vehicle in a timely fashion caused Whitmire to lose his position on the list. Under Georgia law, Whitmire would be entitled to recover profits that could be traced solely to Freightliner's breach and were the immediate fruit of the contract. OCGA § 13-6-8; *Signsation, Inc. v. Harper*, 218 Ga. App. 141, 143 (2) (460 SE2d 854) (1995).

The evidence showed that Whitmire held the sixth position on Southeastern's call list, and that he worked eight years to reach that position. He originally bought the dump truck to enhance his position on the call list in relation to the competing drivers. It was the only new vehicle among the Southeastern drivers, and Whitmire hoped that it would be more dependable. After the accident, Whitmire moved to the bottom of the call list because he could not provide dependable transportation, and he testified that he could not get his former position back because the drivers in front of him had worked just as hard to obtain their positions on the list. Accordingly, Whitmire sought to recover lost profits during the pendency of the repairs, as well as recovery for income he would have received had he maintained his former position.

When a plaintiff demonstrates that his business is a going concern with a history of profitability, he can establish lost profits by evidence of past earnings, expenses, and profits "with reasonable certainty to enable the jury to calculate the damages." (Citations omitted.) *Witty v. McNeal Agency*, 239 Ga. App. 554, 562 (5) (521 SE2d 619) (1999). Such damages may be awarded for a "limited reasonable future time, even though they cannot be computed with exact mathematical certainty." *SMD, L.L.P. v. City of Roswell*, 252 Ga. App. 438, 441 (2) (555 SE2d 813) (2001).

Whitmire introduced his tax returns showing the income and expenses associated with his business. The documentation demonstrated that he had received $34,135.79 from Southeastern alone during 1998. In the weeks prior to the accident, his income averaged more than $1,000 per week from Southeastern; some weeks he earned over $2,000. In addition, the record contains evidence of Whitmire's expenses in connection with the truck. His tax returns showed yearly expenses for fuel, tags, garage service, tires, and repairs. There was also evidence of Whitmire's monthly loan payment on the truck.

We find that this evidence was sufficient to enable the jury to determine Whitmire's lost profits. "The rule against the recovery of vague, speculative, or uncertain damages relates more especially to the uncertainty as to cause, rather than uncertainty as to the measure or extent of the damages. Mere difficulty at fixing their exact amount, where proximately flowing from the alleged injury, does not constitute a legal obstacle in the way of their allowance. . . ." (Citation and punctuation omitted.) *Signsation, Inc. v. Harper*, 218 Ga. App. at 143 (2).

"Unless a jury verdict is palpably unreasonable or excessive, or the product of bias, it will not be disturbed on appeal." (Citation and punctuation omitted.) *Sanders v. Robertson*, 196 Ga. App. 739, 740

(1) (397 SE2d 26) (1990). Here, the jury's verdict was within the range of evidence presented, and it must be affirmed.

2. Freightliner also argues that the trial court erred in failing to grant its motion for directed verdict on the issue of attorney fees. Whitmire sought to recover attorney fees against Freightliner under OCGA § 13-6-11, asserting that the company had acted in bad faith and caused him unnecessary trouble and expense.

An attorney fee award based upon unnecessary trouble and expense cannot be upheld on a breach of contract claim if the evidence showed that a bona fide controversy existed between the parties. *Wynn v. Arias*, 242 Ga. App. 712, 717 (4) (531 SE2d 126) (2000). Because the evidence in this case showed a genuine dispute, attorney fees were not authorized on that ground. See *4WD Parts Center v. Mackendrick*, 260 Ga. App. 340, 345 (2) (c) (579 SE2d 772) (2003).

In contract actions like this one, an award of attorney fees is authorized where the plaintiff can establish bad faith on the part of the defendant in entering into the contract or in connection with the transaction and dealings out of which the cause of action arose. *Kraft v. Dalton*, 249 Ga. App. 754, 755 (549 SE2d 543) (2001). "Bad faith other than mere refusal to pay a debt is sufficient, provided it is not prompted by an honest mistake as to one's rights or duties but by some interested or sinister motive." (Citation and punctuation omitted.) *Williamson v. Harvey Smith, Inc.*, 246 Ga. App. 745, 750 (7) (542 SE2d 151) (2000). Whether Freightliner acted in bad faith in its contractual dealings with Whitmire was an issue for the jury to determine. Id. Even slight evidence of bad faith can be enough to create an issue for the jury. Cf. *Artzner v. A & A Exterminators*, 242 Ga. App. 766, 773 (4) (531 SE2d 200) (2000).

Although there was a great deal of evidence showing Freightliner's efforts and cooperation in attempting to effectuate the repairs, there was also evidence from which the jury could have found that Freightliner acted intentionally in not fully addressing Whitmire's concerns regarding the truck, and instead releasing it to him on multiple occasions as repaired without running appropriate tests or determining if the truck was able to perform as it had pre-collision. In addition, there was evidence that Freightliner acted without authorization in getting a third party to work on the frame rails and then "padded" the bill for such work to Whitmire's insurance company, by adding costs for which it could not fully account at trial. Accordingly, because there is some evidence to support a finding of bad faith and we cannot conclude as a matter of law that there was a reasonable defense establishing Freightliner's good faith, we must affirm the award. See *Ken-Mar Constr. Co. v. Bowen*, 245 Ga. 676, 677 (266 SE2d 796) (1980); *McLeod v. Robbins Assn.*, 260 Ga. App. 347, 349 (3) (579 SE2d 748) (2003).

*Judgment affirmed. Johnson, P. J., and Barnes, J., concur. Andrews, P. J., disqualified.*

DECIDED JULY 7, 2003.

*Clifton M. Patty, Jr., Christopher C. Young,* for appellant.
*Kennedy, Koontz & Farinash, Shannon G. Scearce, Richard T. Klingler,* for appellee.